Is it clear that he saw the police on the first pass? The second time? Yes, it's clear, Your Honor. Two police cars came in in a show of force. It was an action which the police officer's testimony at trial indicates was calculated to get people in the group to scatter. They came in to see what actions, if any, the group would take. Mr. Gwin comes on the police radar when he's following another gentleman, Mr. Harper. Mr. Harper actually runs, and he's the one that Officer Harris sees at that point in time. He's the known gang member. Mr. Gwin, Officer Harris probably is not able to reach Mr. Harper, who he knows. It's not on the record before the Court. It's not a question before the Court whether the police would have had reasonable cause to stop and question Mr. Harper as a known gang member. We don't know if he was on parole, if he was accused of anything or anything like that. But Mr. Gwin is unknown to Officer Harris at that point in time. So when he says, I told him to stop, you can imagine the scene. There's a group scattering. Mr. Harper is running. Officer is going, stop. To whom? Mr. Gwin is walking to his gate. When the officer keeps coming, Mr. Gwin, by the officer's own testimony, runs a couple of steps to the gate, has his key in the lock of his gate when he is forcibly detained by the officer at that point in time. Certainly, when the officer caught up with him, he knew who the officer was talking to, right? At the point in time when the officer laid hands and stopped him to conduct a Terry stop, the facts are undisputed at that point. The Court, our argument in this case is the facts leading up to the stop, the Terry stop in this case. So, go back to my first question. This is different from the war of law because, A, there was a group of people. I'm not sure why that helps. But, B, let me see if I can say what I think you're saying. B, because he was walking at least for a while rather than running. C, because he was walking into a building instead of running away. Is that basically it? That's part of it, Your Honor. The – our argument is based, as I cited in my brief, in United States v. Socolow, which Justice Stevens referred to in Wardlow. He stated that the concept of reasonable suspicion is not readily or even usefully reduced to a neat set of legal rules but must be determined by looking at the totality of circumstances. This Court, in Montero Camargo, noted that facts – there's a requirement of individualized particular suspicion as to the individual who is being subject to the Terry stop. That follows the Supreme Court's decision in Reed v. Georgia, which noted that facts which describe a larger category of presumably innocent people – I mean, I find the set of facts disturbing, but I also find it very difficult to see how they're different from Wardlow, and that's what I need help with. Yes, Your Honor. The facts which I'm trying to stress here are the fact that Mr. Gwinn is in a group engaged in presumably innocent conduct at that point. Mr. Wardlow, which is why they said po-po-po when they drove by, Your Honor, I'm not sure what point the police and the government was trying to make with that phrase. Is it a warning? Is it a taunt? This is an officer doing a very slow drive-by in, you know, what we call a high-crime neighborhood, eyeballing everyone who's standing in that parking lot. What are they going to say? Are they going to stand there and look defiantly? Are they going to say po-po? There's no objective evidence of any attempted hand-to-hand drug transactions or criminal activity or drinking or anything of that nature. It's a – on the record that we have, this is an innocent group. There's no evidence that anyone was doing anything. Mr. Wardlow, to get back to the Court's point, Mr. Wardlow is by himself walking down the street. He glances over, sees four police cars, breaks into a run. That's not what Mr. Gwinn did. And that's why I'm having trouble with. A lot of difference it makes if he's by himself or with a group of people. Frankly, to me, the most – biggest distinction is that instead of running away, he ran into a building where they could find him if they needed him. That is another distinction, Your Honor. Mr. – one of the facts that the Court in its – in its decision denying the motion to suppress found was that Mr. Gwinn was attempting to get to the gate. The officer testified at trial, Mr. Gwinn had his key in the gate at the time he was apprehended, and he said to the officer, leave me alone, or something to that effect, I'm going home, I'm just going home. That is also a very critical distinction between this case and the Wardlow case, Your Honor. My other – my other point, as I raised in my brief, primarily, was the fact that in this particular case, Mr. Gwinn went through the entire process without obtaining an evidentiary hearing on the facts that we are exploring here in court today. Now, what do we have? Is even the police reporting the record? There is no reference to it in either the – the Court's decision or findings of fact. So we do not know if the Court – Nothing. We don't have a declaration. We don't have a police report. We don't have a hearing. We have representations about facts, period, allegations. It's just a memo, a memo of law and fact from the government, a memo of law and fact – But there are no facts in any sense that we – anybody knows the facts. Correct. Correct, Your Honor. But the Court found facts based on those government allegations and noted that they were uncontested. I went through my brief and did a detailed analysis, sort of pointing out where the facts were contested and differed. And it was – it was – you know, it was disturbing that that was never raised properly before the Court, before the case got to trial. And Judge Tanner had a – had an absolute opportunity to remedy that and go back and deduct a fact finding based on evidence. But there's nothing that was pointed – even though I find this a very strange way to proceed, the defendant either originally or even after the trial didn't really point to any fact that really mattered. What fact mattered that could have been proven in a hearing? That's a good question, Your Honor. And the fact which I would point to that is the most prominent in that regard is the fact that the Court found the police were just driving by the second time. As you said, Officer Harris drove by a second time. What the testimony at trial adduced was that two cars came ripping into the parking lot at different angles to block off escape, activated the lights with a third car driven by FBI agent O'Reilly blocking an access. This is an action calculated to create a reaction in the group. The police prompted the group to scatter Mr. Gwynne among them. There is no individual particularized suspicion which separates Mr. Gwynne from anyone else in the group, which was why I was – I was trying to refer the Court to read the – the Georgia. This large category of presumably innocent people of which Mr. Gwynne is entitled to that same presumption took the same actions and scattered. Mr. Gwynne is closer to Mr. Harper. That's the only reason that he draws this officer's attention. Over your time, Judge Thompson, did you have any questions of counsel? No, thank you. Thank you for your argument. Thank you, Your Honor. We'll hear from the government at this time. Mr. McKay. Good morning. Thank you. May it please the Court. I'm John McKay, the United States Attorney for the Western District of Washington. For the government, we seek affirmance of the conviction and judgment imposed by the District Court. I would simply go directly to the earlier questions, Your Honor, as to any distinction with – with Ward law on the underlying facts. I don't think that there are any key distinctions in the facts. I don't believe that any were made clear in the record or in any of the briefing or argument before the Court. There are at least two – maybe more, but at least two. One is that he at least began by walking rather than waging anything one would call headlong flight. Second, he had perhaps some reason for leaving at that point. But thirdly, it doesn't look like he was walking into a building, a house, not running away. It doesn't appear that he was trying to escape physically from the building. Well, I think it's – obviously, there are going to be some factual differences between the cases. No, no. Why isn't that last one important? Your Honor, I would – The police at that point could have stood outside the building if they really thought he had done anything and waited for him to come out. Or if they knew where he was, he wasn't running away from them. Your Honor, I would suggest that some of the key facts are, first, that two individuals preceded Mr. Glynn through that very gate. At least one of whom was known to the stopping officer as a gang member. There were, in fact, two, Your Honor. I believe the record reflects that on the first drive-by, one individual went through the gate and then was peering back from behind the wall at the officers on the second time. Well, I would suggest that the first person went through the very same gate, behaved suspiciously. A second person went through the gate, was a known gang member. The third person through the gate was Mr. Glynn. As to – as to where he was going, I think the totality of the facts would indicate a high degree of suspicion because of the others who preceded him and what they were doing. So as to why he went through the gate, I think those are important facts. They weren't doing anything. They were just leaving him in the police painting. That's what they were doing. Well – They have no evidence that any of those people were actually doing anything, right, other than leaving him in the police painting. That's correct, Your Honor. And I believe Ward law stands for the proposition that in a high-crime area, which is uncontested by Mr. Glynn and his counsel, which this area clearly was, and where flight occurs, there is a reasonable suspicion in the totality of the facts. Suspicion from one person to another. That's different. Now you're arguing that the reason why – that we're supposed to take from the fact that other people left, but that therefore there was reasonable suspicion as to who was doing it, is because of the fact that there was a reasonable suspicion in the totality of the facts. Well, Your Honor, the testimony at the trial by Officer Harris was clear. He began to walk away from the officer, and as the gate closed, he began to run. Now, he fled from Officer Harris. That was Officer Harris's testimony. That was the finding of Judge Rothstein in her original ruling on the motion to suppress, that he fled from the officer. So given her finding in her order, given the testimony of the officer, I don't think there's any doubt that for purposes of the constitutional inquiry, Mr. Glynn fled the officers in a high-crime area. It depends what you call fled. Well, Your Honor, I know that there is other – there is other weight of – of – of opinion that says it really doesn't matter how quickly an individual flees. There is discussion about headlong flight, of course, in – in ward law, but I don't think the speed – the government wouldn't take the position that the speed of the footsteps on the pavement is what – is what is going to determine the constitutional inquiry. I'm not saying that people are entitled to go about their business. And let me – I mean, maybe this is what we mean, that if he was walking, already walking down the street at a normal pace, and the police said stop, and he kept walking, that would be – that would – is this important reason for suspicion? I would suggest – Because he was not – not originally walking, that – that there was suspicion he was standing there, and then when the police came, he left. That's why? I think looking at all of these facts, the fact that he was apparently standing in the parking lot, that he began to depart as the – as the police vehicles pulled into the parking lot, that when asked to stop by the police officer, he, in fact, began to run. And I – the further testimony is that he looked back several times at the uniformed police officer as he then exited – attempted to exit through that gate, which two other individuals had previously fled. So I think the inquiry is – from a constitutional standpoint, as outlined in Ward law, is pretty clear. We do have a high-crime area. I think it's significant on your prior question, Your Honor, that there were a number of individuals present. I think that fact indicates a suspicion. And I believe that the Court does give deference to the arresting officers in this – in this circumstance. I mean, if a bunch of people are out in front of an apartment house at night, that's suspicion? I would – I would suggest that is more suspicious in a high-crime area with the other facts as – as listed than a single person standing in the parking lot. I think that's the experience of any officer on the street. But there are neighborhoods and relationships with people and people's lives, and they can't stand in front of their house without being suspected. Your Honor, I'm – I'm simply getting at your earlier question, which is – and I think fairly to me now – is it more or less suspicious that one person – I don't think it's even more than or less, but not – it's not more. He was trying to say it was less. I don't think it's less, and I don't think it's more. Obviously, I'd like to persuade you, Your Honor, but I think that's the position of the government – government, that – that – that 10 to 15 individuals, a number of whom flee upon the arrival of police officers, is a more suspicious setting than one individual who begins to walk briskly away. I – I would suggest that – that – that the record is – is full of references to facts which are almost directly on point with ward law, including the fact that the arriving officers were in full uniform, that the emergency lights were activated on the police vehicle, a marked patrol vehicle, that a warning was shouted out by individuals present in the – in the parking lot in terms very clear to those individuals as the officers testified, and that it was – it was clear then as the struggle occurred and prior to the time that the evidence was seized, which – which was the subject of the suppression motion, that a reasonable opportunity to further investigate Mr. Gwinn was present from a constitutional standpoint. I – I think that is – is very clear. With respect to the points not particularly focused on in – in oral argument as to the requirement of a – of a hearing in this case, I believe that – that it's correct to say that the – that the original motion filed by Mr. Gwinn contained assertions, if you will, in a motion. There were no accompanying affidavits, and Judge Rothstein, on – on examining that motion, required the government to respond essentially in kind. For purposes of this appeal, I think it's rather clear that the court takes all of the evidence that is available in the record to determine whether the – But there's no evidence available in the record at the – at the point of the motion to suppress. There is a – in the trial, but at the point of the motion to suppress, there is zero evidence. Isn't that right? Zero. I – And you call evidence. There's no affidavit, there's no hearing, there's no police report, there's nothing. I think that's correct, Your Honor. And I would suggest that – that the court, in – in its opinion, in the Todd-Hunter case, makes clear other – other weight of authority that the court, at this point on appeal, looks to all of the evidence that was adduced at trial to determine whether the motion was properly handled by the district judge, and that would be the Todd-Hunter case. So we do have evidence before – and a record before the court as to what – what evidence would appropriately have been considered, either in the initial motion or in a motion for reconsideration. So in other words, you're saying that we should judge the motion by the later evidence. Yes, exactly. It's not available at the time. Exactly, Your Honor. I do. And excuse me, sir. The case you say supports that? That would be the Todd-Hunter case, Your Honor, which is 297, Fed Third, 886, Ninth Circuit Opinion, 2002. We're losing the video of Judge Thompson. Judge Thompson, can you hear me? Your Honors, we seem to have lost the remainder of the panel. Hold on for just a second. Will do. I think we're back again. I can hear you, Your Honor. Okay, fine. Your Honor, I was attempting to give you the citation to the Todd-Hunter case. I'm not sure if you got that. I got 297, and then they cut it off because the network didn't want you to give that cite. But you go ahead anyway. Let me finish, Your Honor. That's United States v. Todd-Hunter, 297, Fed Third, 886, 2002. Thank you, Your Honor. In conclusion, I would again ask that the Court affirm the conviction and judgment in all respects. If there are no further questions, then. I don't see anything for your argument. You can report back to your assistants that you were put through your paces just like they would. I will do that, Your Honor. Some of them are here, so they'll probably carry that back themselves. Thank you. Mr. Chambis, I think we have a little time for a rebuttal. Just briefly, Your Honor. Florida v. Royer is still the law, and the Court concluded in that case that a person can walk away when police approach him and need not answer any questions put to him. He may not be detained even momentarily without a reasonable basis. And I would submit my light just won't stop, but I would submit that in this case, Royer dictates a reversal in this case. Thank you. Thank you very much. Thank you, both counsel, for their arguments. The case discharge will be submitted.
judges: Thompson, Hawkins, Berzon